AMERICAN TRUCKING ASSOCIATIONS, INC., ET AL.
*v.* SCHEINER, SECRETARY, DEPARTMENT OF
REVENUE OF PENNSYLVANIA, ET AL.

No. 86–357.   Argued April 28, 1987—Decided June 23, 1987

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and POWELL, J., joined, *post*, p. 298. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 303.

*Stephen M. Shapiro* argued the cause for appellants. With him on the briefs were *Andrew L. Frey, Kenneth S. Geller, Mark I. Levy, Daniel R. Barney, Robert Digges, Jr., William S. Busker,* and *Walter Hellerstein.*

*Suellen M. Wolfe,* Chief Deputy Attorney General of Pennsylvania, argued the cause for appellees. With her on the brief were *LeRoy S. Zimmerman,* Attorney General, *Andrew S. Gordon,* Chief Deputy Attorney General, *Bryan E. Barbin* and *Michael A. Roman,* Deputy Attorneys General, and *Allen C. Warshaw.**

JUSTICE STEVENS delivered the opinion of the Court.

Again we are "asked to decide whether state taxes as applied to an interstate motor carrier run afoul of the commerce clause, Art. I, §8, of the Federal Constitution." *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs,* 332 U. S.

_____
*Briefs of *amici curiae* urging reversal were filed for the State of North Carolina et al. by *Lacy H. Thornburg,* Attorney General of North Carolina, *Jane P. Gray,* Special Deputy Attorney General, and *David L. Wilkinson,* Attorney General of Utah; for the State of Oklahoma by *Michael C. Turpen,* Attorney General, and *Richard Mildren,* Assistant Attorney General; for the Canadian Trucking Association by *William H. Shawn* and *Kim D. Mann;* and for Yellow Freight System, Inc., et al. by *Lester M. Bridgeman.*

Briefs of *amici curiae* urging affirmance were filed for the State of Arkansas by *Steve Clark,* Attorney General, *Chris Parker,* and *Ted Goodloe;* for the State of New Jersey by *W. Cary Edwards,* Attorney General, and *Michael R. Clancy* and *Mary R. Hamill,* Deputy Attorneys General; for the State of Vermont by *Michael H. Gottesman, Jeffrey L. Amestoy,* Attorney General, and *Thomas R. Viall* and *Robert C. Schwartz,* Assistant Attorneys General; and for the Transportation Cabinet of the Commonwealth of Kentucky by *David Armstrong,* Attorney General of Kentucky, *A. Stephen Reeder,* Special Assistant Attorney General, *James R. Cox,* and *Janet P. Jakubowicz.*

.

495, 496 (1947). That statement of the question presented might equally well have introduced the Court's opinion in either *Spector Motor Service, Inc.* v. *O'Connor*, 340 U. S. 602 (1951), or *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977), which overruled *Spector*. In this case we review the Supreme Court of Pennsylvania's judgment upholding the constitutionality of two Pennsylvania statutes which impose lump-sum annual taxes on the operation of trucks and truck tractors. Our task is by no means easy; the uneven course of decisions in this field reflects the difficulties of reconciling unrestricted access to the national market with each State's authority to collect its fair share of revenues from interstate commercial activity.

Appellants claim that these Pennsylvania statutes violate the principle that no State may discriminate against interstate commerce by enacting a tax which provides a competitive advantage to local business.[1] The Pennsylvania Supreme Court upheld the taxes, interpreting them as facially neutral and in accord with a line of our decisions in the pre-*Spector* era approving flat taxes imposed on interstate truckers for the privilege of using a State's highway system. Before turning to the judgment of the State Supreme Court, we first describe the challenged taxes in some detail in the context of the State's revenue-gathering system and explain why we find persuasive appellants' claims of discrimination. Despite appellees' defense of the revenue provisions as valid compensatory, user-fee, or flat taxes, the judgment of the State Supreme Court must be reversed.

---

[1] "No State, consistent with the Commerce Clause, may 'impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to commercial business.' [*Northwestern States Portland Cement Co.* v. *Minnesota*, 358 U. S. 450, 458 (1959)]. . . . Permitting the individual States to enact laws that favor local enterprises at the expense of out-of-state businesses 'would invite a multiplication of preferential trade areas destructive' of the free trade which the Clause protects. *Dean Milk Co.* v. *Madison*, 340 U. S. 349, 356 (1951)." *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318, 329 (1977).

I

The Commonwealth of Pennsylvania spends large sums of money to improve and maintain its highways and bridges.[2] Passenger and cargo vehicles travel billions of miles on these highways every year.[3]   Operators of large trucks and tractor trailers engaged in interstate commerce make particularly heavy use of the State's highways.   Their vehicles, which may be classified by the number of their axles or by their gross weight—ranging from less than 5,000 pounds for the smallest class to 79,001–80,000 pounds for the 25th class —not only transport cargo between Pennsylvania and out-of-state locations, but also use Pennsylvania's highways extensively as corridors connecting the States of the Northeast, the Southeast, and the Midwest.[4]   Because of their weight and size, trucks using the State's roads require the State to make higher road-related expenditures than would use of the roads by smaller vehicles alone.   App. 30.   The State's hilly terrain and frequently severe weather conditions enhance the

---

[2] For example, during the period from April 1, 1981, through November 30, 1982, the expenditures from Pennsylvania's Motor License Fund that directly benefited motor carriers operating in Pennsylvania were at least $1,551,088,000.   App. 30.

[3] "During calendar year 1979, the most recent period for which detailed figures are currently available, vehicle miles travelled in Pennsylvania were approximately as follows:

"Total Vehicle Miles Travelled, 1979

| | |
|---|---|
| "Total Passenger Vehicles | 58,600,811,505 |
| Auto | 57,291,004,547 |
| Motor Cycle | 911,913,897 |
| School Bus | 124,376,972 |
| Commercial Bus | 273,516,089 |
| "Total Cargo Vehicles | 12,844,167,335 |
| 2 Axle/4 tire | 6,381,130,943 |
| All other Single Trucks | 2,806,356,994 |
| Combination Trucks | 3,656,679,398" |

*Id.*, at 31–32.

[4] For example, the States of New York, New Jersey, Delaware, Maryland, West Virginia, and Ohio share borders with Pennsylvania.

costs of highway maintenance. 510 Pa. 430, 433, 509 A. 2d 838, 840 (1986).

These expenditures are financed, in substantial part, by three types of levies on users of Pennsylvania's highways: vehicle registration fees, fuel consumption taxes, and lump-sum annual fees which we will describe as "flat taxes." Although the two taxes at issue in this litigation are both flat taxes — a $25 "marker fee" assessed from August 18, 1980, through March 31, 1983, and an "axle tax" imposed thereafter — registration fees and fuel taxes are principal sources of revenue for road-related purposes and therefore the mechanics of their collection provide necessary background for our analysis of the economic significance and constitutional validity of the challenged flat taxes.

*Registration Fees*

Owners of motor vehicles that are based in Pennsylvania must register them with the Department of Transportation and pay an annual registration fee. The weight of a truck or truck tractor[5] determines the amount of the annual fee. Prior to 1980, there were 20 weight classifications, and the corresponding fees ranged from $39 to $606 per vehicle. App. 260. In 1980, the registration fees were increased and five new weight classes for heavier vehicles were added to the statutory schedule; from 1980 to 1982 the maximum registration fee was $1,125, for a vehicle weighing 79,001 to 80,000 pounds. *Ibid.* In 1982, the registration fees for vehicles weighing more than 26,000 pounds (classes 9–25) were reduced by multiples of $36 ranging up to a $180 reduction; thereafter, the maximum fee was $945. *Ibid.*

Pennsylvania, many other States, and Provinces of Canada participate in an apportioned registration scheme called the "International Registration Plan" (IRP). Participants in this plan share the registration fees for vehicles based in

---

[5] A truck tractor does not itself carry cargo but is equipped to haul cargo trailers.

their States with other IRP States in which the vehicles travel. The percentage of each vehicle's total registration fee that is allocated to each IRP State other than the State in which the vehicle is based is determined by dividing the total number of miles the vehicle traveled within the IRP State during the preceding year by its total mileage. The total fee payable to each State is the product of each State's total fee for full registration of each vehicle and that State's percentage share of the vehicle's mileage. Thus, if 30% of the mileage of a Pennsylvania-based vehicle was accrued in other States, Pennsylvania's share of the registration fee would be 70% of the full amount specified in its statutory schedule. On the other hand, if a vehicle based in another IRP State logged 40% of its mileage in Pennsylvania, its owner would be required to pay that portion of the Pennsylvania fee schedule to Pennsylvania.[6] Pennsylvania collects no registration fees from motor carriers based in non-IRP States and, conversely, Pennsylvania-based vehicles pay no registration fees to non-IRP States.[7]

---

[6] The parties stipulated to this example:

"[A]ssuming a motor carrier vehicle based in Pennsylvania, state A or state B traveled 50% of its miles in the Commonwealth, 40% in state A, and 10% in state B, and assuming the full registration fees for those states were $400, $300, and $200 respectively, the registration fees paid by that vehicle would be as follows (if states A and B are IRP-member jurisdictions . . . ):

|  |  |
|---|---|
| "To Pennsylvania: | 50% x $400 = $200 |
| To state A: | 40% x $300 = $120 |
| To state B: | 10[%] x $200 = $ 20 |
|  | ——— |
| Total registration fee: | $340" |

App. 38–39.

[7] Thus, if the example used in n. 6, *supra*, is modified by assuming that State A is not an IRP State, 90% of Pennsylvania's $400 fee, or $360, would be payable to Pennsylvania; in that event, the total registration would be $380, of which $20 would be payable to State B.

Pennsylvania also has nonapportioned reciprocity agreements with non-IRP States. A Pennsylvania-based carrier that pays a registration fee

In sum, the amount of each truck's registration fee is determined by the weight of the vehicle and, if the truck travels in other IRP States, in part by its in-state mileage. No vehicle is required to pay more than one full registration fee.

## Fuel Consumption Taxes

Pennsylvania collects a fuel consumption tax in two ways. It imposes a per-gallon fuel tax on fuel purchased within the State. The State also requires trucks that travel less than 90% of their miles in Pennsylvania to pay a tax based on their miles traveled in Pennsylvania, reduced by the amount of the tax actually paid through fuel purchased at Pennsylvania pumps. See Pa. Stat. Ann., Tit. 72, §§ 2611d, 2614.4, and 2617.1–2617.26 (Purdon 1964 and Supp. 1987). The amount of these taxes does not depend on the vehicle's State of registration.

## The Flat Taxes

Pennsylvania requires an identification marker issued by the Department of Revenue to be affixed to every motor carrier vehicle. A motor carrier vehicle is a "truck, truck tractor or combination having a gross weight or registered gross weight in excess of 17,000 pounds." 75 Pa. Cons. Stat. § 102 (1984). Until 1980, the fee for the issuance of this marker was $2. In that year the fee was increased to $25, but vehicles registered in Pennsylvania were exempted from the fee. The statute effected this exemption by providing that for each vehicle registered in Pennsylvania the "marker fee shall

---

to Pennsylvania obtains the privilege of operating the vehicle over the highways of "all other states with which Pennsylvania has registration reciprocity respecting that vehicle registration." *Id.*, at 42. Likewise, carriers that pay registration fees to States with which Pennsylvania has reciprocity agreements receive the privilege of operating their vehicles on the roads of their home state and "the roads of all other states, including Pennsylvania, with which the home state has registration reciprocity." *Ibid.*

be deemed a part of and included in the vehicle registration fee." §2102(b).

The parties have stipulated that the administrative costs associated with the issuance of the identification markers total approximately $5 per vehicle. App. 22. In 1982, when it enacted the axle tax, Pennsylvania reduced the annual marker fee from $25 to $5 per vehicle. §2102(b). Since 1982, then, the marker fee is sufficient only to meet the specific cost of issuing the marker, but the effect of the $25 marker fee from 1980 to 1982 was to impose a flat tax on vehicles registered in other States. This tax was, at least nominally, not imposed on Pennsylvania-registered vehicles. It should be noted, however, that the same statute that increased the marker fee in 1980 to $25 for out-of-state vehicles weighing more than 17,000 pounds also increased Pennsylvania's registration fees for such vehicles by amounts substantially larger than $25.

In 1982, Pennsylvania enacted its axle tax and, as noted, reduced the marker fee to $5 per vehicle. The axle tax applies to all trucks, truck tractors, and combinations weighing more than 26,000 pounds, whether registered in Pennsylvania or elsewhere; it requires an annual payment of $36 per vehicle axle. 75 Pa. Cons. Stat. §9902 (1984). For example, the tax is $72 for a two-axle vehicle and $180 for a five-axle vehicle. If a truck travels less than 2,000 miles in Pennsylvania, however, it is entitled to a rebate: the axle tax paid multiplied by the ratio of the amount by which the vehicle's in-state mileage was short of 2,000 miles to 2,000 determines the rebate amount. §9905. Moreover, the axle tax is excused when a trucker pays $25 for a trip permit for a period not exceeding five days. §2102(d).

The same statute that enacted the axle tax in 1982 also reduced the registration fees for all weight classes of vehicles of more than 26,000 pounds. In classes 9–12, which generally include two-axle vehicles required to pay a $72 axle tax, the reduction amounted to $72; in classes 13–17, which usually

include three-axle vehicles subject to a $108 axle tax, it amounted to $108; in classes 18, 19, and 20, usually four-axle vehicles subject to a $144 axle tax, it amounted to $144, and in the five heaviest classes—vehicle weights exceeding the permissible weight for four-axle vehicles—it amounted to $180.[8]   In brief, the amounts of the reductions in all classes were a multiple of the $36 per axle which is used as the measure for the axle tax.   App. 260.

## II

Appellants represent a class of interstate motor carriers whose vehicles are registered outside of Pennsylvania and who paid the $25 marker fee while it was in effect and who have thereafter been subject to the axle tax.   They brought separate actions in the Commonwealth Court of Pennsylvania challenging the constitutionality of the $25 marker fee and of the axle tax.   In each case, appellants made two separate arguments based on the Commerce Clause of the Federal Constitution.

First, they argued that the entire economic burden of each tax fell on out-of-state vehicles because the 1980 statute "deemed" the marker fee for Pennsylvania vehicles to be a part of the registration fee, and the 1982 legislation granted Pennsylvania vehicles a reduction in registration fees that

---

[8] The explanation for the substantial congruence between the amount of the reductions in registration fee and the amount of axle tax imposed lies in the statutory requirement that a truck with a given number of axles may not exceed a specified weight.   As Chief Justice Nix explained in his dissent, the registration fee "reductions correspond to the number of axles most commonly used and minimally required by law in each weight class. . . . Except in a few instances, the [registration fee] reductions created by the Act were intended to and did exactly offset the impact of the Axle Tax upon motor carrier vehicles registered in Pennsylvania."   510 Pa. 430, 467, n. 1, 509 A. 2d 838, 858, n. 1 (1986).   The Commonwealth Court had also found that the reductions in registration fees "generally offset the tax owed based on the number of axles ordinarily required of vehicles within each affected weight class."   *American Trucking Assns., Inc.* v. *Bloom,* 87 Pa. Commw. 379, 382, 487 A. 2d 465, 467 (1985).

neatly offset the newly imposed axle tax. Second, they argued that even if owners of vehicles registered in Pennsylvania, through payment of registration fees, shared the burden of the two flat taxes with owners of vehicles based elsewhere, the taxes were nevertheless discriminatory because both taxes imposed a much heavier charge per mile of highway usage by out-of-state vehicles. On the average, the Pennsylvania-based vehicles subject to the flat taxes travel about five times as many miles on Pennsylvania roads as do the out-of-state vehicles; correspondingly, the cost per mile of each of the flat taxes is approximately five times as high for out-of-state vehicles as for local vehicles.[9] Although out-of-state and in-state vehicles subject to the axle tax traveled approximately the same number of miles on Pennsylvania's highways, less than one-sixth of the State's total axle tax revenues were generated by Pennsylvania-based vehicles in fiscal years 1982–1983 and 1983–1984.[10]

In both the marker fee case and the axle tax case the Commonwealth Court accepted appellants' first argument and did not consider the second. In the first case, the court reasoned:

---

[9] In 1981 the cost of the marker fee was more than $\frac{1}{2}$ cent per mile for all foreign-based motor carrier vehicles and about $\frac{1}{10}$ cent per mile for all Pennsylvania-based motor carrier vehicles. App. 104.

[10] In an affidavit supporting appellee's motion for summary judgment, the Secretary of the Department of Revenue stated:

"Axle tax revenues for fiscal year 1982–83 and fiscal year 1983–84 are as follows:

| "Trucks registered in Pennsylvania | Trucks registered other than Pa. | Temporary Permits | Fines | Total |
|---|---|---|---|---|
| $ 8,684,008 | $45,292,372 | $1,147,855 | — | $55,124,235 |
| $12,314,308 | $62,088,820 | $4,547,849 | $1,448,872 | $80,399,849 |

"The Department of Revenue is in the process of paying axle tax rebates for the April 1, 1983 to March 31, 1984 period and estimates that rebates will total about $6,000,000." App. 207.

"A state tax on interstate commerce does not offend the Commerce Clause . . . if that tax [1] is applied to an activity with a substantial nexus with the taxing state, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the state. *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274[, 279] (1977). . . . Section 2102(b) facially fails the third prong of the *Complete Auto* standard which prohibits discrimination against interstate commerce. Notwithstanding legislative legerdemain in the insertion of the obfuscating term 'deemed,' Pennsylvania-registered vehicles were *exempted* from, and foreign-registered vehicles were *subject* to, the marker decal fee. 'The commerce clause forbids discrimination, whether forthright or ingenious.' *Best & Co.* v. *Maxwell,* 311 U. S. 454, 455 (1940) (footnote omitted)." *American Trucking Assns., Inc.* v. *Bloom,* 77 Pa. Commw. 575, 581, 466 A. 2d 755, 757 (1983).

The Commonwealth Court ordered a refund of marker fee payments made after April 1, 1982. *Id.,* at 581–582, 466 A. 2d, at 758. Sitting en banc, the Commonwealth Court overruled defendants' exceptions to the trial judge's order. *American Trucking Assns., Inc.* v. *Bloom,* 87 Pa. Commw. 345, 487 A. 2d 468 (1985). The en banc court inferred from the legislature's nonenactment of increased registration fees to keep pace with the marker levy imposed on vehicles based outside of Pennsylvania "a legislative intent to exempt Pennsylvania-registered motor carriers from payment of the $25.00 marker fee." *Id.,* at 350, 487 A. 2d, at 471.

Appellants in the case challenging the axle tax represent a class of all interstate motor carriers who own vehicles registered outside of Pennsylvania who are or will be subject to the tax, and a subclass consisting of such interstate motor carriers who are registered in any of the States or the Provinces of Canada that are not members of the IRP. Appellants contended that the axle tax, together with the simulta-

neous reduction in registration fees substantially offsetting the axle tax for Pennsylvania-registered vehicles, is facially discriminatory and in practice imposes the axle tax only on interstate motor carriers registered outside of Pennsylvania. Appellants also argued that the axle tax is an invalid flat tax wholly unrelated to the benefits received by interstate motor carriers. Sitting en banc, the Commonwealth Court declared that the axle tax violated the Commerce Clause and ordered a refund of axle tax payments made by affected class members after April 1, 1983. 87 Pa. Commw. 379, 487 A. 2d 465 (1985). The court found that operators of foreign-registered vehicles bore the "full brunt of the tax" and concluded that the axle tax therefore "constitutes economic protectionism and is facially invalid." *Id.*, at 383, 487 A. 2d, at 467.

The Supreme Court of Pennsylvania considered the two cases together and reversed. 510 Pa. 430, 509 A. 2d 838 (1986).[11] The Court began its analysis by noting that the prohibition against discrimination was included in the four-part test stated in *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977), and that it was essential to focus on the "effect or economic consequences of the state tax upon interstate commerce." 510 Pa., at 449, 509 A. 2d, at 848.

Pursuing this inquiry, the State Supreme Court rejected the trial court's conclusion that the full burden of both taxes was imposed on foreign-registered vehicles. With respect to the marker fee, the Court considered irrelevant the legislative history supporting a contrary inference, because the plain language of the statute "deemed" a portion of the reg-

---

[11] A third case, involving a refund claim for the two years that the $25 marker fee was in effect, presented the same legal issue as the other two. The Commonwealth Court held that it did not have jurisdiction over the case because appellants had not initially sought refunds from the Board of Finance and Revenue. 87 Pa. Commw. 418, 489 A. 2d 269 (1985). The Pennsylvania Supreme Court considered this third case along with the other two. In view of its rejection in the first case of the constitutional challenges to the marker fee, the court affirmed without reviewing the Commonwealth Court's ruling on the exhaustion issue.

istration fee to constitute payment of the marker fee for Pennsylvania vehicles. The Court thus found no discrimination in the operation of the marker fee because the statute "imposed a $25.00 marker fee on all motor carriers in the class represented by appellees and deemed a like amount of the simultaneous increase in Pennsylvania registration fees as the marker fee for Pennsylvania registered vehicles." *Id.*, at 453, 509 A. 2d, at 850. Moreover, even if the statute had not explicitly provided that Pennsylvania-registered vehicles are regarded as having paid a marker fee, the simultaneous increase in the registration fee when the $25 marker fee was enacted made it "apparent that the marker fee does not work *any* discrimination against interstate commerce in practical operation." *Ibid.*

The court thus viewed the marker fee as a flat tax applied equally on all vehicles using the State's highways. The court offered two reasons why this flat tax was not discriminatory despite its imposition of a greater cost per mile on non-Pennsylvania registered vehicles. First, relying on our opinions in *Evansville-Vanderburgh Airport Authority District* v. *Delta Airlines, Inc.*, 405 U. S. 707 (1972), and *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609 (1981), the Court reasoned that a State may impose a tax for the privilege of using its highways "so long as the flat fee charged is not manifestly disproportionate to the services rendered." 510 Pa., at 457, 509 A. 2d, at 852. Second, the Court found that interstate motor carriers could not protest that the burden of the flat fee fell too heavily upon them, for they "are free to use the Commonwealth's highways as often and for whatever distances they wish." *Ibid.*

In the axle tax case, the Court found that the tax was collected from Pennsylvania and non-Pennsylvania-registered vehicles alike and thus presented no question of discrimination "[o]n its face and in actual operation." *Id.*, at 459, 509 A. 2d, at 853. The Court acknowledged that a difficulty arose when it considered the tax together with the statutory

reduction in 1982 of registration fees paid by Pennsylvania-based vehicles subject to the axle tax, but concluded that even though the reduction in registration fees offset the axle taxes for Pennsylvania-based vehicles, this reduction had to be viewed against the earlier increase in 1980 of registration fees. According to the State Supreme Court, the net effect of the restructuring of the tax system over the 2-year period was "to enact a compensatory tax to neutralize or partially offset an economic advantage previously enjoyed by interstate commerce to the disadvantage of local commerce that was caused by operation of that state's taxing scheme." *Id.*, at 462, 509 A. 2d, at 855. Taking all provisions of the State's highway user-fee system into account, the court reasoned that members of appellants' class bore less of the tax burden than Pennsylvania-registered motor vehicles. *Id.*, at 460–463, 509 A. 2d, at 854–855. The Court concluded that "in easing the burden on Pennsylvania registered vehicles, the Commonwealth has neither disadvantaged interstate commerce nor favored local commerce, and the axle tax does not, therefore, discriminate against interstate commerce." *Id.*, at 462, 509 A. 2d, at 855.

### III

Although we have described our own decisions in this area as a "quagmire" of judicial responses to specific state tax measures, *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 457–458 (1959), we have steadfastly adhered to the central tenet that the Commerce Clause "by its own force created an area of trade free from interference by the States." *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318, 328 (1977). See also *Armco Inc.* v. *Hardesty,* 467 U. S. 638, 642 (1984). One primary consequence of this constitutional restriction on state taxing powers, frequently asserted in litigation, is that "a State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Ibid.;* see also *Westinghouse Electric Corp.* v. *Tully,* 466

U. S. 388, 403 (1984). In its guarantee of a free trade area among States, however, the Commerce Clause has a deeper meaning that may be implicated even though state provisions, such as the ones reviewed here, do not allocate tax burdens between insiders and outsiders in a manner that is facially discriminatory.[12]

The parties broadly state the constitutional question in this appeal as whether Pennsylvania's flat taxes result in a blanket discrimination against interstate commerce. The operator of a Pennsylvania-based vehicle that engages in interstate commerce, however, has no apparent quarrel with the challenged flat taxes; he is "deemed" to pay the $25 marker fee through his registration fee, and the axle taxes he paid beginning in 1982 were generally offset by the statutory re-

---

[12] Our more recent cases repeat a theme that recurred in an early series of decisions invalidating facially neutral taxes on nonresident solicitors, or "drummers," seeking to engage in business within the taxing jurisdiction. In *Nippert* v. *Richmond*, 327 U. S. 416 (1946), we explained:

"As has been so often stated but nevertheless seems to require constant repetition, not all burdens upon commerce, but only undue or discriminatory ones, are forbidden. For, though 'interstate business must pay its way,' a State consistently with the commerce clause cannot put a barrier around its borders to bar out trade from other States and thus bring to naught the great constitutional purpose of the fathers in giving to Congress the power 'To regulate Commerce with foreign Nations, and among the several States . . . [.]' Nor may the prohibition be accomplished in the guise of taxation which produces the excluding or discriminatory effect." *Id.*, at 425–426.

"Provincial interests and local political power are at their maximum weight in bringing about acceptance of this type of legislation. With the forces behind it, this is the very kind of barrier the commerce clause was put in the fundamental law to guard against. It may be, as the Court said in the *Berwind-White* case, that the State is free to allow its municipal subdivisions to erect such barriers against each other, to some extent, as to the commerce over which the State has exclusive control. It cannot so outlaw or burden the commerce of the United States.

"The drummer is a figure representative of a by-gone day. But his modern prototype persists under more euphonious appellations. So endure the basic reasons which brought about his protection from the kind of local favoritism the facts of this case typify." *Id.*, at 434–435.

duction in vehicle registration fees. But some operators of vehicles based in other States or Provinces have neither consolation, for they have paid registration fees to their own jurisdictions and still face Pennsylvania's axle taxes. The precise issue is therefore more subtle: do the methods by which the flat taxes are assessed discriminate against some participants in interstate commerce in a way that contradicts the central purpose of the Commerce Clause? We find dispositive those of our precedents which make it clear that the Commerce Clause prohibits a State from imposing a heavier tax burden on out-of-state businesses that compete in an interstate market than it imposes on its own residents who also engage in commerce among States.[18]

The way in which a tax levied on participants in interstate commerce is measured and assessed bears directly on whether it implicates central Commerce Clause values. The method of assessing the marker and axle taxes in this case on Pennsylvania-based vehicles and on other vehicles establishes that the State is not treating the two types of vehicles with an even hand. There are important and obvious differences of a constitutional magnitude between the State's registration fees and fuel taxes, on the one hand, and its flat taxes, on the other.

The State's vehicle registration fee has its counterpart in every other State and the District of Columbia. See 2 CCH State Tax Guide ¶¶ 50–200—50–940 (2d ed. 1986). It is a tax that readily satisfies the test of "internal consistency" that

---

[18] "This free trade purpose [of the Commerce Clause] is not confined to the freedom to trade with only one State; it is a freedom to trade with any State, to engage in commerce across all state boundaries.

"There has been no prior occasion expressly to address the question whether a State may tax in a manner that discriminates between two types of interstate transactions in order to favor local commercial interests over out-of-state businesses, but the clear import of our Commerce Clause cases is that such discrimination is constitutionally impermissible." *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S., at 335.

we have applied in other contexts.[14]  Under this test, even though the registration fee is assessed, as indeed it has been, by every jurisdiction, it causes no impermissible interference with free trade because every State respects the registration of every other State.  Payment of one registration fee enables a carrier to operate a vehicle either locally or in the interstate market.  Having paid one registration fee, a vehicle may pass among the States as freely as it may roam the State in which it is based; the Commerce Clause is not offended when state boundaries are economically irrelevant.

Yet even if more than one jurisdiction applies a charge to participants in interstate commerce, the Commerce Clause may be satisfied if the revenue measures maintain state boundaries as a neutral factor in economic decisionmaking. Pennsylvania's fuel consumption taxes, for example, do not hinder the maintenance of a free trade area among States. The fuel consumption taxes are directly apportioned to the mileage traveled in Pennsylvania; they are therefore simply payments for traveling a certain distance that happens to be within Pennsylvania.  When a vehicle uses other States' roads, it may be subject to their fuel taxes, but the free trade area is unimpaired; if one sovereign controlled the entire free trade area, it would have the equivalent authority to impose a charge for the use of all of its roads.[15]

---

[14] See *Tyler Pipe Industries, Inc.* v. *Washington Dept. of Revenue, ante,* at 247; *Armco Inc.* v. *Hardesty,* 467 U. S. 638, 644–645 (1984); *Container Corp. of America* v. *Franchise Tax Board,* 463 U. S. 159, 163 (1983).

[15] It might be objected that if other States impose lower fuel taxes or forgo them entirely, then Pennsylvania's tax is inconsistent with a free trade area because it furnishes a disincentive to travel throughout that State.  But the disincentive affects local and out-of-state vehicles in precisely the same way, and thus does not implicate the Commerce Clause. When a tax does establish a difference in treatment, however, the "immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment."  *Freeman* v. *Hewit,* 329 U. S. 249, 256 (1946).  The adverse

The unapportioned flat taxes, however, penalize some travel within the free trade area. Whether the full brunt, or only a major portion, of their burden is imposed on the out-of-state carriers, their inevitable effect is to threaten the free movement of commerce by placing a financial barrier around the State of Pennsylvania. To pass the "internal consistency" test, a state tax must be of a kind that, "if applied by every jurisdiction, there would be no impermissible interference with free trade." *Armco Inc.* v. *Hardesty,* 467 U. S., at 644. If each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no conceivable doubt that commerce among the States would be deterred.[16]

economic impact in dollars and cents upon a participant in interstate commerce for crossing a state boundary and thus becoming subject to another State's taxing jurisdiction is neither necessary to establish a Commerce Clause violation, see *Armco Inc.* v. *Hardesty,* 467 U. S., at 644, nor sufficient, see *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274, 289 (1977) (taxes on interstate business are not invalid *per se*).

[16] A line of cases invalidating unapportioned flat taxes that provided general revenue also illustrates the principle that the very nature of the market that interstate operators serve prevents them from making full use of the privilege of doing business for which they have paid the State. Thus, we found that a tax on drummers in the city of Memphis for the privilege of doing business there on behalf of out-of-state firms discriminated against out-of-state manufacturers. We reasoned that their local competitors, "having regular licensed houses of business [in Memphis], have no occasion for such agents, and, if they had, they are not subject to any tax therefor. They are taxed for their licensed houses, it is true; but so, it is presumable, are the merchants and manufacturers of other states in the places where they reside; and the tax on drummers operates greatly to their disadvantage in comparison with the merchants and manufacturers of Memphis." *Robbins* v. *Shelby County Taxing District,* 120 U. S. 489, 498 (1887). See also *Best & Co.* v. *Maxwell,* 311 U. S. 454, 456–457 (1940) (annual flat tax on those who were not regular retail merchants in the State invalid because its actual effect "is to discriminate in favor of intrastate businesses, whatever may be the ostensible reach of the language"); *Nippert* v. *Richmond,* 327 U. S. 416 (1946). As one commentator observed almost half a century ago:

Although the actual imposition of flat taxes by other jurisdictions is not necessary to sustain the Commerce Clause challenge to Pennsylvania's flat taxes under the "internal consistency" test, the adoption of these flat taxes by other jurisdictions even before the Pennsylvania suits were resolved surely suggests that acquiescence in these flat taxes would occasion manifold threats to the national free trade area. Since 1980 when Pennsylvania authorized the $25 marker fee, six other States have also adopted flat taxes[17] and seven States have adopted retaliatory levies that are assessed on motor carrier vehicles that are based in Pennsylvania or another flat-tax State.[18] Such taxes[19] can obviously divide and disrupt the market for interstate transportation services.[20]

---

"True, each fee is imposed upon the use of different states' highways, but the cumulative effect does not result from the mileage or distance traveled, but from the interstate character of the journey. The same mileage in one state would result in only one tax." Lockhart, State Tax Barriers to Interstate Trade, 53 Harv. L. Rev. 1253, 1269 (1940).

[17] The States are Arkansas, Ark. Stat. Ann. §§ 75–817.2, 75–817.3 (a)(3), (4), and (5) (Supp. 1985); Indiana, Ind. Code Ann. § 6–6–8–6 (Burns Supp. 1986); Kentucky, Ky. Rev. Stat. § 138.660(4)–(7) (Supp. 1986); Maryland, Md. Transp. Code Ann. § 13–423(a) (1984); New Jersey, N. J. Stat. Ann. § 54.39 A–10 (West 1986); and Vermont, Vt. Stat. Ann., Tit. 23, §§ 415, 3007, 3010 (1978 and Supp. 1986–1987).

[18] The States are Florida, Fla. Stat. § 207.004(5)(d) (1986); Georgia, Ga. Code. Ann. § 40–2–111 (1985); Maine, Me. Rev. Stat. Ann., Tit. 29, § 2243 (Supp. 1986–1987); Nebraska, Neb. Rev. Stat. § 60–305.03 (1984); New Jersey, N. J. Stat. Ann. § 39:3–6 (West 1973); Oklahoma, Okla. Stat., Tit. 47, § 1120 (Supp. 1986); and Vermont, Vt. Stat. Ann., Tit. 23, § 417 (Supp. 1986–1987).

[19] The parties stipulated that if all the States in which appellant Old Dominion Freight Lines, Inc. operated were to impose a $25 marker fee, the cost of qualifying its vehicles in every State in which it operates its vehicles would amount to a figure that is many times larger than the company's net pretax income in fiscal year 1981. App. 27–28.

[20] Flat-rate license taxes, "if adopted by many cities and states, bear much more heavily in the aggregate on a firm that sells in many places than on a firm otherwise identical (and in particular, with the same total quantity of sales) that sells in only one place." Regan, The Supreme Court and

In practical effect, since they impose a cost per mile on appellants' trucks that is approximately five times as heavy as the cost per mile borne by local trucks, the taxes are plainly discriminatory.[21] Under our consistent course of decisions in recent years a state tax that favors in-state business over out-of-state business for no other reason than the location of its business is prohibited by the Commerce Clause. *Tyler Pipe Industries, Inc.* v. *Washington Dept. of Revenue, ante,* p. 232; *Bacchus Imports, Ltd.* v. *Dias,* 468 U. S. 263 (1984); *Armco Inc.* v. *Hardesty,* 467 U. S. 638 (1984); *Westinghouse Electric Corp.* v. *Tully,* 466 U. S. 388 (1984); *Maryland* v. *Louisiana,* 451 U. S. 725 (1981); *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318 (1977). Nor is the axle tax saved because some out-of-state carriers which accrue high mileage in Pennsylvania pay the axle tax at a lower per-mile rate than some Pennsylvania-based carriers; it makes no difference that the axle tax, on its face, does not exact a lower per-mile charge from Pennsylvania-based carriers than from out-of-state carriers. Like the exemption from wholesaling tax for goods manufactured in Washington that we struck down in *Tyler Pipe Industries, Inc.*, the axle tax has a forbidden impact on interstate commerce because it exerts an inexorable hydraulic pressure on interstate businesses to ply their trade within the State that enacted the measure rather

State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich. L. Rev. 1091, 1188 (1986).

[21] "It is true also that a State may impose, even on motor vehicles engaged exclusively in interstate commerce, a reasonable charge as their fair contribution to the cost of constructing and maintaining the public highways. . . . But no part of the license fee here in question may be assumed to have been prescribed for that purpose. A flat tax, substantial in amount and the same for busses plying the streets continuously in local service and for busses making, as do many interstate busses, only a single trip daily, could hardly have been designed as a measure of the cost or value of the use of the highways." *Sprout* v. *South Bend,* 277 U. S. 163, 170 (1928).

than "among the several States." U. S. Const., Art. I, § 8, cl. 3.

## IV

Notwithstanding our recent precedents invalidating various state taxation measures that failed the "internal consistency" test, Pennsylvania advances three arguments in defense of its flat taxes. They are said to reflect a reasonable charge for the privilege of using its roads when considered alongside the high price that Pennsylvania-based trucks pay in registration fees. Appellees also argue that the flat taxes are no different from the flat user fees this Court has recently upheld. Finally, talismanically invoking decisions in which we upheld flat taxes for the privilege of doing business within a State, appellees contend that a mere disparity in per-mile costs between interstate and intrastate truckers provides no basis upon which to strike down a tax. We are persuaded, however, that none of the cases relied upon by appellees controls our disposition.

### The "Rational Restructuring" Defense

Appellees expressly acknowledge that the axle tax cannot be defended as a compensatory tax that equalizes previously unequal tax burdens by offsetting "a specific tax imposed only on intrastate commerce for a substantially equivalent event." Brief for Appellees 18. See *Tyler Pipe Industries, Inc.* v. *Washington Dept. of Revenue, ante,* at 242–244; *Armco Inc.* v. *Hardesty,* 467 U. S., at 642–643; *Henneford* v. *Silas Mason Co.,* 300 U. S. 577, 584 (1937). Instead, they argue that the axle tax does not discriminate against interstate commerce because "it is but a small part of Pennsylvania's multi-tiered scheme of taxes and fees designed to finance an extensive highway system." Brief for Appellees 17. Appellees contend that domestic trucks pay a higher price to use Pennsylvania's highways than those registered in other States, and specifically, that the totality of the tax and fee changes since 1980 has resulted in higher relative taxes

on trucks registered in Pennsylvania. The registration fee reductions in 1982 only partially offset these increases. We find this argument unavailing.

Appellees' reasoning is based on the erroneous premise that relief for Pennsylvania-based trucks is constitutionally permissible because they are subject to a higher financial burden for their use of Pennsylvania's roads than trucks based in other States must pay for use of the same roads. This premise is flawed for three reasons. Pennsylvania-based trucks are allowed to travel throughout the United States without paying more than one registration fee; the registration fees they pay are not solely for the use of Pennsylvania's highways. In addition, while it is true that registration fees are lower in some States, they are also higher in some other States. See, e. g., App. 178. Most importantly, even if the relative amounts of the States' registration fees confer a competitive advantage on trucks based in other States, the Commerce Clause does not permit compensatory measures for the disparities that result from each State's choice of tax levels. To the extent that a competitive disadvantage is conferred on Pennsylvania carriers by the relative amounts of the States' registration fees, the remedy lies in a change in their level, the enlargement of participation in the IRP,[22] or the collection of revenues through valid taxes. The axle tax cannot be vindicated as a "rational restructuring of burdens" simply because it arguably benefits a class of

---

[22] The flat taxes would appear to create a disincentive to participation in the IRP because the statute is unclear as to whether trucks based in IRP States are required to pay not only their share of Pennsylvania's registration fees, but the $25 marker fee and the axle tax as well. See 75 Pa. Cons. Stat. §§ 2102(b), (d)(1) (1984) ("The fee for issuance of an identification marker prior to and including March 31, 1983 shall be $25 and thereafter the fee shall be $5. . . . The Secretary of Revenue may by regulation exempt from the requirement to display the identification marker motor carrier vehicles which in his opinion are clearly identifiable such that effective enforcement of this chapter will not suffer thereby"); § 9902 ("all motor carriers shall pay an annual tax in the amount of $36 per axle").

truckers that pays more to use the State's highways than does another class of highway users. As one commentator has observed, "[i]mplementation of a rule of law that a tax is nondiscriminatory because other taxes of at least the same magnitude are imposed by the taxing State on other tax-payers engaging in different transactions would plunge the Court into the morass of weighing comparative tax burdens." J. Hellerstein, 1 State Taxation: Corporate Income and Franchise Taxes ¶4.12[5], p. 150 (1983). The flat taxes must stand or fall on their own.

### The User-Fee Defense

Taken on their own, the marker fee and axle tax are wholly unlike the user fees we upheld in *Evansville-Vanderburgh Airport Authority District* v. *Delta Airlines, Inc.*, 405 U. S. 707 (1972), a case relied upon by the Pennsylvania Supreme Court. *Evansville-Vanderburgh* involved the question whether a municipal airport authority could collect a flat service fee of $1 for each passenger boarding a commercial aircraft operating from the airport.[23] After reviewing our decisions concerning highway tolls, as well as the cases holding that a State may impose a flat fee for the privilege of using its roads without regard to the actual use by particular vehicles, so long as the fee is not excessive, we stated:

> "At least so long as the toll is based on some fair approximation of use or privilege for use, as was that before us in *Capitol Greyhound* [*Lines* v. *Brice*, 339 U. S. 542 (1950)], and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more

---

[23] In response Congress prohibited any "tax, fee, head charge, or other charge" on air travel. 49 U. S. C. App. § 1513(a). If Congress should disagree with this decision, it would, of course, have the power to authorize flat taxes of this kind. See *Prudential Insurance Co.* v. *Benjamin*, 328 U. S. 408, 434 (1946).

exactly the relative use of the state facilities by individual users." *Id.*, at 716–717.

We then explained why the $1 fee satisfied the two essential conditions that it be neither discriminatory nor excessive:

> "The Indiana and New Hampshire charges meet those standards. *First*, neither fee discriminates against interstate commerce and travel. While the vast majority of passengers who board flights at the airports involved are traveling interstate, both interstate and intrastate flights are subject to the same charges. Furthermore, there is no showing of any inherent difference between these two classes of flights, such that the application of the same fee to both would amount to discrimination against one or the other. See *Nippert* v. *Richmond*, 327 U. S. 416 (1946).
>
> "*Second*, these charges reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed." *Id.*, at 717.

Pennsylvania's flat taxes satisfy neither of these conditions: They discriminate against out-of-state vehicles by subjecting them to a much higher charge per mile traveled in the State, and they do not even purport to approximate fairly the cost or value of the use of Pennsylvania's roads.

The Pennsylvania Supreme Court also relied on *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609 (1981). The State of Montana imposed a severance tax on coal at the same rate whether the final destination of the coal was local or interstate. We rejected the taxpayer's discrimination claim, which was premised on the fact that 90% of Montana coal was shipped to other States under contracts that shifted the tax burden principally to utility companies outside of Montana and that therefore imposed the bulk of the tax burden on out-of-state consumers of Montana coal. We held that "there is no real discrimination in this case; the tax burden is borne according to the amount of coal consumed and not according to

any distinction between in-state and out-of-state consumers." *Id.*, at 619. Because the tax was a percentage of the value of the contract, and because only Montana could impose the tax, every holder of an equivalently valued contract paid the same tax; whether the shipment crossed a state border was irrelevant to the magnitude of the tax burden imposed by Montana. The flat taxes in this case are distinguishable in two ways. First, the amount of Pennsylvania's marker and axle taxes owed by a trucker does not vary directly with miles traveled or with some other proxy for value obtained from the State. "[W]hen the measure of a tax bears no relationship to the taxpayers' presence or activities in a State, a court may properly conclude under the fourth prong of the *Complete Auto Transit* test that the State is imposing an undue burden on interstate commerce." *Id.*, at 629. As Justice Frankfurter argued in his dissent in *Capitol Greyhound Lines* v. *Brice*, 339 U. S. 542, 557 (1950):

> "So long as a State bases its tax on a relevant measure of actual road use, obviously both interstate and intrastate carriers pay according to the facilities in fact provided by the State. But a tax levied for the privilege of using roads, and not their actual use, may, in the normal course of operations and not as a fanciful hypothesis, involve an undue burden on interstate carriers. While the privilege extended by a State is unlimited in form, and thus theoretically the same for all vehicles, whether interstate or intrastate, the intrastate vehicle can and will exercise the privilege whenever it is in operation, while the interstate vehicle must necessarily forego the privilege some of the time simply because of its interstate character, *i. e.*, because it operates in other States as well. In the general average of instances, the privilege is not as valuable to the interstate as to the intrastate carrier."

Second, unlike the Montana coal tax, highway use taxes can be imposed by other States.

> "And because it operates in other States there is danger—and not a fanciful danger—that the interstate carrier will be subject to the privilege taxes of several States, even though his entire use of the highways is not significantly greater than that of intrastate operators who are subject to only one privilege tax." *Ibid.* (footnote omitted).

Justice Frankfurter thus illuminated the reason that a State's imposition of an unapportioned flat tax, unlike the neutral user fee in *Evansville-Vanderburgh* and the neutral severance tax in *Commonwealth Edison Co.*, discriminates against interstate commerce.

### The Flat-Tax Defense

Third, the cases in support of the State's authority to impose flat use taxes, while lending support to appellees' argument, can no longer suffice to uphold flat taxes with the blatantly discriminatory consequences associated with the marker fee and axle tax.

In *Clark* v. *Poor*, 274 U. S. 554 (1927), the Court held that users of a State's highways, "although engaged exclusively in interstate commerce, may be required to contribute to their cost and upkeep. . . . There is no suggestion that the tax discriminates against interstate commerce." *Id.*, at 557. A few years later in *Aero Mayflower Transit Co.* v. *Georgia Public Service Comm'n*, 295 U. S. 285 (1935), the Court sustained an annual license fee of $25 imposed on both out-of-state and domestic vehicles, concluding that the case was so similar to *Clark* v. *Poor, supra*, "as to apply a closure to debate." 295 U. S., at 289. Unlike the *Clark* case, however, the Court considered and rejected an argument that it was unfair to impose the same charge upon an interstate carrier as upon a local carrier that used the roads more. The Court reasoned that the fee covered the same privilege for both carriers:

"The appellant urges the objection that its use of roads in Georgia is less than that by other carriers engaged in local business, yet they pay the same charge. The fee is not for the mileage covered by a vehicle. There would be administrative difficulties in collecting on that basis. The fee is for the privilege of a use as extensive as the carrier wills that it shall be. There is nothing unreasonable or oppressive in a burden so imposed. Cf. *Clark* v. *Poor, supra; Hicklin* v. *Coney*, [290 U. S. 169 (1933)]. One who receives a privilege without limit is not wronged by his own refusal to enjoy it as freely as he may." 295 U. S., at 289.

In a second case brought by the same interstate carrier, the Court again relied on the principle of *Clark* v. *Poor* to support the proposition that "a state, consistently with the commerce clause, may lay upon motor vehicles engaged exclusively in interstate commerce, or upon those who own and so operate them, a fair and reasonable nondiscriminatory tax as compensation for the use of its highways." *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs*, 332 U. S., at 503. *Aero Mayflower* held that two flat taxes imposed by Montana on each commercial vehicle operated on its highways did not discriminate against interstate commerce; "[b]oth levies apply exclusively to operations wholly within the state or the proceeds of such operations, although those operations are interstate in character. " *Id.*, at 502. The Court was careful to identify the consideration for the taxes as the privilege of using the State's highways,[24] and to point out that the appellant had erred by failing to distinguish between a tax on that privilege and a tax on the privilege of engaging in interstate commerce:

[24] "The present taxes on their face are exacted 'in consideration of the use of the highways of this state,' that is, they are laid for the privilege of using those highways." 332 U. S., at 503.

"Appellant therefore confuses a tax 'assessed for a proper purpose and . . . not objectionable in amount,' *Clark* v. *Poor, supra,* at 557, that is, a tax affirmatively laid for the privilege of using the state's highways, with a tax not imposed on that privilege but upon some other such as the privilege of doing the interstate business. Though necessarily related, in view of the nature of interstate motor traffic, the two privileges are not identical, and it is useless to confuse them . . . ." *Id.,* at 504.

Later in the opinion, the Court again emphasized the fact that the gross revenue fee was exacted in consideration for the privilege of using the State's highways, not for the privilege of doing interstate business. *Id.,* at 506.

The distinction between a tax on the privilege of using a State's highways and a tax on the privilege of engaging in interstate commerce was also dispositive in *Spector Motor Service, Inc.* v. *O'Connor,* 340 U. S. 602 (1951), decided just four years later. Again addressing a tax on an interstate motor carrier, the Court this time invalidated it, distinguishing *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs* because the *Spector* tax was "not levied as compensation for the use of highways," 340 U. S., at 607, and was not a tax on sales or use. "It is a 'tax or excise' placed unequivocally upon the corporation's franchise for the privilege of carrying on exclusively interstate transportation in the State." We explained:

"Even though the financial burden on interstate commerce might be the same, the question whether a state may validly make interstate commerce pay its way depends first of all upon the constitutional channel through which it attempts to do so. *Freeman* v. *Hewit,* 329 U. S. 249 [1946]; *McLeod* v. *Dilworth Co.,* 322 U. S. 327 [1944]." *Id.,* at 608.

In our more recent decisions we have rejected this somewhat metaphysical approach to the Commerce Clause that fo-

cused primarily on the character of the privilege rather than the practical consequences of the tax.[25]   In 1977, while we recognized that we had invalidated privilege taxes on in-state activity deemed to be part of interstate commerce, we also noted that we had "moved toward a standard of permissibility of state taxation based upon its actual effect rather than its legal terminology." *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S., at 281.   "These decisions have considered not the formal language of the tax statute but rather its practical effect, and have sustained a tax against Commerce Clause challenge when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Id.*, at 279.   In *Complete Auto Transit, Inc.*, we not only observed that the *Spector* rule against a tax on the privilege of interstate commerce "has no relationship to economic realities," 430 U. S., at 279, and expressly overruled the *Spector* case itself, 430 U. S., at 289, but also concluded that "the philosophy underlying the rule [that interstate commerce is immune from state taxation has] been rejected." *Id.*, at 288.   In ruling that the theoretical underpinnings of this rule had been eroded, we necessarily called into question the future vitality of earlier cases that had upheld facially neutral flat taxes against challenges premised on the rule of immunity for interstate commerce.   Unsuccessful challenges had then been turned away on the theory that the State was not taxing the conduct of interstate commerce, but instead was taxing a unitary, formally defined privilege that was sometimes part of intrastate commerce and sometimes part of interstate commerce.   Now

---

[25] Compare, *e. g.*, *Interstate Transit, Inc.* v. *Lindsey*, 283 U. S. 183 (1931) (invalidating state tax on exclusively interstate motor carriers' carrying capacity as a tax on privilege of engaging in interstate commerce), with *Hicklin* v. *Coney*, 290 U. S. 169 (1933) (upholding state tax on carrying capacity of interstate carriers which earmarked proceeds for highway maintenance as highway use tax).

that it has been firmly established that interstate commerce as such has no immunity from state taxation, it is no longer appropriate to uphold a flat tax merely because the particular formula by which its charges are reckoned extends the same nominal privilege to interstate commerce that it extends to in-state activities. Such formalism "merely obscures the question whether the tax produces a forbidden effect." *Ibid.*

Thus, the precedents upholding flat taxes can no longer support the broad proposition, advanced by appellees, that every flat tax for the privilege of using a State's highways must be upheld even if it has a clearly discriminatory effect on commerce by reason of that commerce's interstate character. Although out-of-state carriers obtain a privilege to use Pennsylvania's highways that is nominally equivalent to that which local carriers receive, imposition of the flat taxes for a privilege that is several times more valuable to a local business than to its out-of-state competitors is unquestionably discriminatory and thus offends the Commerce Clause. The great constitutional purpose of the Fathers cannot be defeated by using an apparently neutral "guise of taxation which produces the excluding or discriminatory effect." *Nippert* v. *Richmond,* 327 U. S. 416, 426 (1946). Those precedents are still valid, however, in their recognition that the Commerce Clause does not require the States to avoid flat taxes when they are the only practicable means of collecting revenues from users and the use of a more finely gradated user-fee schedule would pose genuine administrative burdens.[26]

---

[26] In *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs,* 332 U. S. 495 (1947), after disposing of the appellant's main claims, the Court in a footnote summarily rejected appellant's alternative claim that the minimum fee of $15 on gross receipts was unreasonable because it imposed a tax roughly 10 times greater than would be required if the percentage standard set forth in the statute (0.5% of gross operating revenues) were used. We observed that the "Federal Constitution does not require the state to elaborate a system of motor vehicle taxation which will reflect with exact precision every gradation in use. In return for the $15 fee appellant can do business grossing $3,000 per vehicle annually for operations on Mon-

The administrative machinery of revenue collection for highways is now obviously capable of taking into account at least the gross variations in cost per unit of highway usage between Pennsylvania-based and out-of-state carriers that are presented by these facts. Pennsylvania, as noted, uses mileage figures to apportion motor carriers' registration fees among IRP jurisdictions, to collect fuel taxes from trucks that travel less than 90% of their miles in Pennsylvania, and to calculate axle tax rebates. Pennsylvania also apportions the corporate income tax it imposes on interstate carriers by the carrier's total miles traveled in the State. Pa. Stat. Ann., Tit. 72, § 7401(3)2(b) (Purdon Supp. 1987).[27] While flat taxes may be perfectly valid when administrative difficulties make collection of more finely calibrated user charges impracticable, we conclude that this justification is unavailable in the case of Pennsylvania's unapportioned marker fee and axle tax.

## V

Appellees request that in the event of an adverse decision, the Court remand the case to the Pennsylvania Supreme Court to consider whether our ruling should be applied retroactively and to decide other remedial issues. We agree that having

tana roads. Appellant was not wronged by its failure to make the full use of the highways permitted." *Id.*, at 506, n. 19. Our disposition was thus based on the costs the State would encounter in collecting taxes for vehicles that earned less than $3,000 annually in Montana. We also emphasized the administrative impossibility of precise apportionment according to road use in *Capitol Greyhound Lines* v. *Brice*, 339 U. S. 542, 546 (1950). In that case we upheld a 2% tax on the fair market value of motor vehicles for the use of state highways as a rough approximation of use because of the administrative burden of applying a tax formula that would vary "with every factor affecting appropriate compensation for road use."

[27] See also Brief for State of North Carolina et al. as *Amici Curiae* 21 (each of these States, which recoup highway costs through registration fees apportioned to mileage under the IRP and through motor fuel purchase and use taxes directly related to miles traveled within the State, experiences no administrative difficulties).

decided the constitutional issue presented to us, we should remand for further proceedings in the marker fee, axle tax, and marker fee refund suits. See *Tyler Pipe Industries, Inc.* v. *Washington Dept. of Revenue, ante,* at 251–253.

The judgment of the Pennsylvania Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE POWELL join, dissenting.

In finding Pennsylvania's "flat" highway use taxes unconstitutional under the Commerce Clause, the Court today directly overrules the holdings of at least three cases: *Capitol Greyhound Lines* v. *Brice,* 339 U. S. 542 (1950); *Aero Mayflower Transit Corp.* v. *Board of Railroad Comm'rs,* 332 U. S. 495 (1947); and *Aero Mayflower Transit Co.* v. *Georgia Public Service Comm'n,* 295 U. S. 285 (1935). These cases were apparently cited with approval as recently as *Massachusetts* v. *United States,* 435 U. S. 444, 463–464 (1978), and *Evansville-Vanderburgh Airport Authority District* v. *Delta Airlines, Inc.,* 405 U. S. 707, 715–717 (1972). In *Massachusetts* the opinion states:

> "[W]e turn to consider the Commonwealth's argument that § 4491 should not be treated as a user fee because the amount of the tax is a flat annual fee and hence is not directly related to the degree of use of the airways. This argument has been confronted and rejected in analogous contexts. *Capitol Greyhound Lines* v. *Brice,* 339 U. S. 542 (1950) is illustrative. . . . Noting that the tax 'should be judged by its result, not its formula, and must stand unless proven to be unreasonable in amount for the privilege granted,' *id.,* at 545, the Court rejected the carrier's argument:
>
> "'Complete fairness would require that a state tax formula vary with every factor affecting appropriate com-

pensation for road use. These factors, like those relevant in considering the constitutionality of other state taxes, are so countless that we must be content with "rough approximation rather than precision." . . . Each additional factor adds to administrative burdens of enforcement, which fall alike on taxpayers and government. We have recognized that such burdens may be sufficient to justify states in ignoring even such a key factor as mileage, although the result may be a tax which on its face appears to bear with unequal weight upon different carriers. . . . Upon this type of reasoning rests our general rule that taxes like that of Maryland here are valid unless the amount is shown to be in excess of fair compensation for the privilege of using state roads.' *Id.*, at 546–547. (Citations and footnotes omitted).

"See also *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs*, 332 U. S. 495 (1947) . . . ." *Massachusetts* v. *United States, supra,* at 463–464.

I am aware of the substantially contemporaneous criticism of the *Aero Mayflower* line of decisions. See, *e. g., Capitol Greyhound Lines* v. *Brice, supra,* at 548–560 (Frankfurter, J., dissenting); Brown, The Open Economy: Justice Frankfurter and the Position of the Judiciary, 67 Yale L. J. 219, 232 (1957); Lockhart, State Tax Barriers to Interstate Trade, 53 Harv. L. Rev. 1253, 1267–1270 (1940). Flat highway use taxes may potentially pose a serious practical burden for interstate commerce. See *ante,* at 284–287. Certainly, as a matter of first impression the constitutionality of flat highway use taxes could have been resolved differently. Nonetheless, this particular issue has been settled now for over 50 years and Congress has not seen fit to pre-empt these taxes by exercising its commerce power, though, of course, it has had recent occasion to consider and reconsider the problems of the trucking industry. See Motor Carrier Act of 1980, 94 Stat. 793 *et seq.,* as amended, 49 U. S. C. § 10101 *et seq.;* see generally Thoms, Rollin' On . . . To a Free Market: Motor

Carrier Regulation 1935–1980, 13 Trans. L. J. 43 (1983). If and when the practical problems that the Court envisions occur, Congress may correct them. Indeed, as the Brief for State of Vermont as *Amicus Curiae* 3–8 sets out in some detail, Congress, the Executive, and the States have, in fact, recently and actively considered the issue. See H. R. 4518, 98th Cong., 1st Sess. (1983); Surface Transportation Issues: Hearings before the Subcommittee on Surface Transportation of the House Committee on Public Works and Transportation, 98th Cong., 2d Sess. (1984) (hereinafter 1984 Hearings); Oversight of the Motor Carrier Act of 1980: Hearings before the Subcommittee on Surface Transportation of the House Committee on Public Works and Transportation, 98th Cong., 1st Sess. (1983). Federal action has been deferred while the National Governors' Association attempts to develop uniform national standards for taxation of interstate motor carriers. 1984 Hearings 1201–1213; see National Governors' Association Center for Policy Research, An Experiment in Federalism: Can the States Improve the Interstate Motor Carrier Taxation System?, Capital Ideas (Feb. 1, 1986).

In the meantime, the reliance interest sought to be protected by the doctrine of *stare decisis* has grown up around the settled rule. For example, Pennsylvania has collected some $300 million in axle taxes to be spent on highway improvements that, of course, largely benefit the interstate trucking industry. Brief for Appellees 7. In my view, Pennsylvania, in structuring its program for financing highway construction and repair, had every reason to rely upon the settled understanding that flat highway taxes reasonably related to the extent of the benefit conferred do not violate the Commerce Clause. Similarly, Arkansas, appearing as *amicus curiae* here, opened its highways to the heaviest trucks only upon the understanding that it might collect sufficient revenue from those trucks by means of flat taxes to compensate for the damage they do to its roads. See *Ameri-*

can Trucking Assns., Inc. v. Gray, 288 Ark. 488, 503–504, 707 S. W. 2d 759, 766–767 (1986), cert. pending, No. 86–358. If this flat tax is also unconstitutional, then Arkansas is left with the damage but without the taxes. Brief for State of Arkansas as *Amicus Curiae* 6 (estimating incremental damage by heavy trucks at $53 million annually). In light of these reliance interests, in my view, if a new rule is to be declared, Congress should do it. *Capitol Greyhound Lines* v. *Brice,* 339 U. S., at 547.

The Court's suggestion, *ante,* at 294–296, that the *Aero Mayflower* line of cases is somehow intimately bound up with the rule of *Spector Motor Service, Inc.* v. *O'Connor,* 340 U. S. 602 (1951), and therefore was overruled *sub silentio* along with *Spector* in *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977), is easily refuted. The fact of the matter is that *Spector* and *Complete Auto Transit* involved a state tax on the privilege of doing business, an entirely different form of state taxation, that *Spector* found that form of taxation *unconstitutional* and therefore had to *distinguish* the *Aero Mayflower* line of decisions, see *Spector Motor Service, Inc.* v. *O'Connor, supra,* at 607, and n. 4, and that this Court explicitly relied on the *Aero Mayflower* line *after Complete Auto Transit* in *Massachusetts* v. *United States,* 435 U. S., at 463–464. Similarly, the Court's reliance upon *Nippert* v. *Richmond,* 327 U. S. 416 (1946), is inappropriate. Again a somewhat different form of taxation was involved in *Nippert* and the case *predates* both *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs,* 332 U. S. 495 (1947), and *Capitol Greyhound Lines* v. *Brice, supra.*

Appellants argue that circumstances have so substantially changed since the days of *Aero Mayflower* and its progeny that the cases, even if they had some basis when they were decided, have no basis now. They point to the growth of the interstate trucking industry and the increased reliance on mileage apportioned taxes in our time and argue that presently the extent of the burden on interstate commerce

is greater, and the administrative inconvenience associated with apportioned taxes less. These arguments are not without some force. Significantly changed circumstances can make an older rule, defensible when formulated, inappropriate, and we have reconsidered cases in the dormant Commerce Clause area before. See, *e. g.*, *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609, 614–617 (1981), disapproving statements in *Heisler* v. *Thomas Colliery Co.*, 260 U. S. 245 (1922); *Hughes* v. *Oklahoma*, 441 U. S. 322, 326–336 (1979), overruling *Geer* v. *Connecticut*, 161 U. S. 519 (1896); *Complete Auto Transit, Inc.*, *supra*, at 278–289, overruling *Spector Motor Service, Inc.*, *supra*. But the changes that appellants point to are of degree, not kind. Interstate trucking and mileage-based taxes were certainly not oddities when *Capitol Greyhound Lines* v. *Brice*, *supra*, was decided in 1950. See, *e. g.*, *Interstate Busses Corp.* v. *Blodgett*, 276 U. S. 245 (1928) (upholding mileage-based tax and noting existence of fuel tax). Indeed, the substantial contemporaneous criticism of the *Aero Mayflower* line of cases makes clear that the potential burden on interstate commerce that flat taxes posed, and the existence of feasible alternatives, were fully understood at the time these cases were decided. In short, I do not believe that the evolutionary changes we have seen in the trucking industry are substantial enough to defeat the strong *stare decisis* concerns, and the resulting reliance interests of the States, present here.

Neither does *Armco Inc.* v. *Hardesty*, 467 U. S. 638 (1984), dictate a different result. The West Virginia taxation scheme in that case on its face discriminated against out-of-state manufacturers: "if the property was manufactured in the State, no tax on the sale is imposed. If the property was manufactured out of the State and imported for sale, a tax of 0.27% is imposed on the sale price." *Id.*, at 642. Since this facially discriminatory tax could not be justified under the compensatory tax doctrine, *id.*, at 642–643, it was held unconstitutional. See *Maryland* v. *Louisiana*, 451

U. S. 725, 758–760 (1981). There is nothing in *Armco* to suggest that the *Aero Mayflower* line of cases was being implicitly disapproved or even that these cases were considered at all relevant to the case before the Court. Nor do I read *Armco* as establishing a grandiose version of the "internal consistency test" as the constitutional measure of all state taxes under the Commerce Clause. See *ante*, at 282–284; cf. *Tyler Pipe Industries, Inc.* v. *Washington Dept. of Revenue*, *ante*, at 254–259 (SCALIA, J., dissenting). In my view, the fact that the tax in *Armco* was facially discriminatory sufficiently supports holding that tax invalid under the Commerce Clause. At most, *Armco* may be read for the proposition that a tax that is facially discriminatory is unconstitutional if it is not "internally consistent." In no way does it stand for the proposition that *nondiscriminatory* state taxes must also generally be "internally consistent" to pass constitutional muster. Creating an "internal consistency" rule of general application is an entirely novel enterprise that the Court undertakes for the first time in this case. Yet the Court gives no reason why such a rule is necessary or desirable, nor does it discuss the views of the lower courts or commentators. Indeed, the limited scholarly work on general application of the internal consistency test is largely negative. See, *e. g.*, Judson & Duffy, An Opportunity Missed: *Armco, Inc.* v. *Hardesty*, A Retreat From Economic Reality in Analysis of State Taxes, 87 W. Va. L. Rev. 723, 739–740 (1985); Lathrop, *Armco*—A Narrow and Puzzling Test for Discriminatory State Taxes Under the Commerce Clause, 63 Taxes 551, 557 (1985). I am simply unwilling to follow the Court down this path without some greater understanding of the need, and authority, for doing so. I respectfully dissent.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE joins, dissenting.

I agree with the Court that the "internal consistency" test it adopts requires invalidation of the Pennsylvania axle tax and marker fee—as it would any unapportioned flat tax in-

volving multistate activities. For the reasons given in my dissent in *Tyler Pipe Industries, Inc.* v. *Washington Dept. of Revenue, ante,* p. 254, I do not believe that test can be derived from the Constitution or is compelled by our past decisions. The same tax is imposed on in-state as on out-of-state trucks; that is all I would require. See *Capitol Greyhound Lines* v. *Brice,* 339 U. S. 542 (1950); *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs,* 332 U. S. 495 (1947); *Aero Mayflower Transit Co.* v. *Georgia Public Service Comm'n,* 295 U. S. 285 (1935).

The Court's disposition relieves it of the need to address appellants' narrower contention that the axle tax is facially discriminatory because the same law that introduced it reduced registration fees for Pennsylvania-based trucks by, for all practical purposes, precisely the amount of the axle taxes. I would reject that challenge as well. The axle tax is imposed uniformly on both in-state and out-of-state vehicles, and is therefore not facially discriminatory. The registration fee is imposed only on in-state trucks, and its reduction likewise does not facially discriminate against interstate commerce. Since both the axle tax and the reduction in registration fees are independently nondiscriminatory, I would sustain them.

Appellants rely on *Maryland* v. *Louisiana,* 451 U. S. 725 (1981), in which we invalidated Louisiana's use tax on offshore gas because the State credited payments of that tax against other taxes imposed on local commerce, such as the severance tax on in-state production, and exempted gas used for certain in-state activities from the tax. *Id.,* at 732–733, 756. That case is readily distinguishable. Pennsylvania provides no exemption from its axle tax for in-state truckers, and does not permit axle tax payments to be used as credits against the registration fee. The axle tax *alone*—unlike the gas tax in *Maryland* v. *Louisiana*—is on its face nondiscriminatory.

It may well be that the lowering of the exclusively intra-
state registration fee has the same net effect as would a tax
credit for the axle tax. But so would have the establishment
of the registration fee and the axle tax at their current levels
in the first place. To determine the facially discriminatory
character of a tax not on the basis of the tax alone, but on the
basis of the structure of a State's tax code, is to extend our
case law into a new field, and one in which principled distinc-
tions become impossible. What if, for example, the registra-
tion fees for Pennsylvania-based barges, rather than trucks,
had been reduced in an amount that precisely compensated
for the additional revenues to be derived from the increased
axle fees? Or what if Pennsylvania had enacted the axle tax
without reducing registration fees, and then one year later
made a corresponding reduction in truck registration fees?
This case, of course, is more difficult than those examples,
because the tax reduction and axle tax both apply to the same
mode of transport and were enacted simultaneously. How-
ever, to inquire whether a tax reduction is close enough in
time or in mode to another tax so that "in effect" the latter
should be treated as facially discriminatory is to ask a ques-
tion that has no answer.

Legislative action adjusting taxes on interstate and intra-
state activities spans a spectrum, ranging from the obviously
discriminatory to the manipulative to the ambiguous to the
wholly innocent. Courts can avoid arbitrariness in their re-
view only by policing the entire spectrum (which is impossi-
ble), by policing none of it, or by adopting rules which subject
to scrutiny certain well-defined classes of actions thought
likely to come at or near the discriminatory end of the spec-
trum. We have traditionally followed the last course, confin-
ing our disapproval to forms of tax that seem clearly designed
to discriminate,* and accepting the fact that some amount

---

*There is one area where we seem to have based our decisions less on
the form of the tax than on the character of the activity taxed: the "drum-
ming" cases, where we have invalidated, without elaborate inquiry, facially

of discrimination may slip through our net. A credit against intrastate taxes falls readily within the highly suspect category; a reduction of intrastate taxes to take account of increased revenue from a nondiscriminatory axle tax does not.

I acknowledge that the distinction between a credit and a straight reduction is a purely formal one, but it seems to me less absurd than what we will be driven to if we abandon it. The axle tax and registration fee reduction in this case appeared in the same bill. Extend the rule to treat that as "in effect" a tax credit, and the next case will involve two different bills enacted the same day, or a week apart, or at the beginning and end of the same session. A line must be drawn somewhere, and (in the absence of direction from any authoritative text) I would draw it here.

---

neutral taxes on soliciting activities. See, *e. g., Nippert* v. *Richmond,* 327 U. S. 416 (1946). "Everybody knows" that these laws have but a single purpose, to protect local merchants from out-of-town (and hence out-of-state) competition. The temptation was great to presume that whole class of taxes, regardless of their nondiscriminatory form, guilty until proved innocent. I do not think those cases are an attractive model on which to base a more general Commerce Clause jurisprudence.