Argued and submitted October 15, 2003, reversed and remanded in part with
instructions; otherwise affirmed April 28, 2004

## AMERICAN TRUCKING ASSOCIATIONS, INC.,
a District of Columbia corporation;
CRST, Inc.,
an Iowa corporation;
USF Reddaway, Inc.,
an Oregon corporation;
Kenneth E. Mansigh Trucking, Inc.,
a Washington Corporation;
and Veneer Chip Transport, Inc.,
a Washington corporation,
on behalf of themselves and all other
similarly-situated weight-distance taxpayers,
*Appellants,*

*v.*

STATE OF OREGON,
Department of Transportation
and Director Grace Crunican,
Department of Transportation,
*Respondents,*

*and*

AAA Oregon/Idaho,
an Oregon corporation,
*Intervenor - Respondent.*

00C-16242; A117694

90 P3d 15

186

Robert Digges, Jr., admitted *pro hac vice*, Alexandria, Virginia, argued the cause for appellants. With him on the briefs were Jonathan M. Hoffman, Justin M. Thorp, and Martin, Bischoff, Templeton, Langslet & Hoffman, LLP, and American Trucking Associations, Alexandria, Virginia.

David E. Leith, Assistant Attorney General, argued the cause for respondents. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Scott G. Seidman argued the cause and filed the brief for intervenor - respondent. With him on the brief were Paul W. Conable, and Tonkon, Torp, LLP.

Before Edmonds, Presiding Judge, and Wollheim and Brewer, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

■ Plaintiffs, the American Trucking Associations, Inc., and several individual trucking companies, assert that two aspects of the manner in which the State of Oregon taxes heavy trucks that use its highways violate the dormant Commerce Clause of the federal constitution. Those aspects are the flat fee options for certain commodities and the farm truck fuel tax; we describe them in detail below.[1] Plaintiffs sought a declaratory judgment, an injunction, and a refund of taxes paid. Defendants are the State of Oregon, the Oregon Department of Transportation, the department's director, and intervenor-defendant AAA Oregon/Idaho. The trial court held in favor of defendants and dismissed the action.[2] We reverse as to the flat fee options and affirm as to the farm truck fuel tax.

■ We state the facts as we find them on *de novo* review, which is generally consistent with the trial court's findings.[3] However, we draw our own legal conclusions from those facts. The primary method under which Oregon taxes heavy trucks that use its highways is a weight-mile tax. ORS 825.450 - 825.555. Under that tax, a trucking carrier pays a rate for each mile that its trucks operate on the state's public highways. The tax is based on the weight that the carrier declares to be the truck's maximum legal weight; the higher

---

[1] The tax court's jurisdiction does not extend to disputes over motor carrier taxes. ORS 305.410(1)(g). The Marion County Circuit Court therefore had jurisdiction of this case.

[2] The trial court dismissed the action rather than entering a declaration of the parties' rights. Although the parties do not raise the point, that action was erroneous. "If there is a justiciable controversy, the plaintiff is entitled to a declaration of its rights, even if that declaration is directly contrary to what it believes its rights to be." *Beldt v. Leise*, 185 Or App 572, 576, 60 P3d 1119 (2003). On remand, the trial court should enter a judgment that declares the parties' rights on the issues in dispute.

[3] The parties assume that a declaratory judgment action is legal in nature and that we review the trial court's findings for any evidence to support them. However, a declaratory judgment action may be either legal or equitable, depending on the nature of the case and the relief sought. *Ken Leahy Construction, Inc. v. Cascade General, Inc.*, 329 Or 566, 571, 994 P2d 112 (1999). In this case, the relief that plaintiffs seek is primarily equitable, and our review is *de novo*. ORS 19.415(3) (2001).

the declared weight, the higher the per-mile tax for that truck. ORS 825.474 - 825.476.[4] A truck that pays the weight-mile tax does not pay the fuel tax that the state charges other vehicles and may take any fuel tax paid as a credit against the weight-mile tax. ORS 825.486. A carrier must maintain records of the declared weights of its trucks and the miles that they travel in order to make the required reports and calculate the amount of tax owed.

Plaintiffs do not question the constitutionality of the weight-mile tax itself. Rather, they attack two exceptions to it. The first exception concerns the flat fee options provided in ORS 825.480 for certain commodities. That statute gives carriers of three categories of commodities—logs, sand and gravel carried in dump trucks, and wood chips—the option to choose to pay a flat fee rather than the weight-mile tax. ORS 825.480(1), (4), and (5). For each commodity, the legislature established the fee at an amount that it believed to be identical to what a truck of the same weight carrying that commodity would pay in weight-mile tax if it operated as many miles per year as an average truck that carried that commodity. The calculations are based on the assumption that the truck in question operates entirely in Oregon. The flat fee option is available to carriers who are located in Oregon or any other state. The legislature has adjusted the amounts a number of times in order to reflect changes in the average mileage and in the weight-mileage rates since it originally adopted the flat fee options. If a carrier elects a flat fee option, it must do so for all the trucks in its fleet that carry that commodity, and it may make that election only once per year. ORS 825.480(2). A carrier that chooses to pay a flat fee must still report the mileage that it travels on public highways, OAR 740-055-0120; however, because those reports do not affect the taxes that the carrier pays, the state does not audit them.

Trucks carrying commodities that have a flat fee option are more likely than trucks carrying other commodities to use nonpublic roads for significant portions of their

---

[4] For heavier trucks the number of axles may also affect the amount of the tax; those details are not relevant to the issues in this case.

trips, to use lesser-traveled public roads, and to make multiple short journeys. All of those factors make it more difficult for carriers to keep the records that the weight-mile tax requires and for the state to enforce the tax. Flat fee carriers also tend to be small operators, for whom record keeping is especially burdensome. Thus, one purpose of the flat fee options is to ease the burden on both the carriers and the state of administering and enforcing the weight-mile tax.

Although the legislature intended the flat fee options to be revenue neutral, they are not, at least for haulers of logs or of sand and gravel. The best estimates, based on data that are not fully reliable, are that, for the most recent period for which figures were available at the time of trial, wood chip carriers who chose the flat fee option as a group paid $27,315.75 more than they would have paid under the weight-mile tax, while sand and gravel carriers paid $276,535.86 less and log carriers paid $1,164,585.86 less. For sand and gravel carriers, the underpayments are equivalent to 1.34 cents per mile, while for log carriers they are equivalent to 1.9 cents per mile. For purposes of comparison, the average profit margin in the trucking industry is 3 cents per mile.

The above evidence has several implications. The structure of the taxing system makes it probable that carriers that choose the flat fee options will, as a group, pay less than if they paid the weight-mile tax. Only a carrier that expects to save money will choose to pay a flat fee. Although the reduced record keeping and reporting costs will produce some savings to the carrier, the primary benefit that the options provide is to reduce the total tax bill of a carrier whose trucks operate for more miles than the presumed average that the legislature used to calculate the amount of the flat fee.[5] The fact that very few wood chip carriers chose the flat fee, while many log and sand and gravel carriers did so, supports that point. The few wood chip carriers who chose the option actually paid more on average than they would have under the weight-mile tax; that fact suggests that it is

---

[5] A carrier who chooses the flat fee must pay the weight-mile tax when its trucks carry commodities that do not qualify under the option that the carrier chose.

unusual for a truck carrying wood chips to exceed the presumed annual mileage. On the other hand, many carriers who carry the other flat fee commodities chose the flat fee and, overall, experienced substantial savings as a result. The implication is that many trucks carrying those kinds of commodities exceed the presumed annual mileage.

The second exception to the weight-mile tax that is in issue in this case is the exemption for trucks that qualify for registration as farm vehicles. To qualify, a truck must be owned by the owner or renter of a farm that actually produces agricultural products or livestock in sufficient quantities to require the use of a truck. ORS 805.310. The owner can use the truck only for limited purposes that involve hauling the farmer's products or livestock; hauling supplies, equipment, or material to be consumed on the farm; or hauling similar products for another farmer on a bona fide exchange of labor basis. ORS 805.390. A qualified vehicle does not pay the weight-mile tax but instead pays the state's standard fuel tax based on gallons of fuel purchased, which in most circumstances will result in a substantial cost savings to the farmer. Farm vehicles may carry commodities that would otherwise be carried by commercial carriers, who would pay the weight-mile tax. The fuel tax option is available to trucks that are located in Oregon or any other state.

Plaintiffs argue that those statutory exceptions to the weight-mile system for taxing heavy trucks violate the Commerce Clause of Article I, section 8, of the United States Constitution. That clause authorizes Congress, among other things, to "regulate Commerce * * * among the several States[.]" In *Cooley v. Board of Wardens of Port of Philadelphia et al.*, 53 US (12 How) 299, 13 L Ed 996 (1852), the Supreme Court interpreted the Commerce Clause as doing more than authorizing Congressional action; it also places limitations on a state's ability to regulate or otherwise interfere with interstate commerce even in the absence of legislation. As the Court more recently described it, the Commerce Clause " ' by its own force created an area of trade free from interference by the States.' " *Boston Stock Exchange v. State Tax Comm'n*, 429 US 318, 328, 97 S Ct 599, 50 L Ed 2d 514 (1977), *quoting Freeman v. Hewit*, 329 US 249, 252, 67 S Ct 274, 91 L Ed 265 (1946). That aspect of the Commerce

Clause is known as the "dormant Commerce Clause" because the clause limits state action by its very existence. Among other things, the dormant Commerce Clause prohibits a state from taxing interstate commerce in a way that provides a competitive advantage to local businesses. *American Trucking Assns., Inc. v. Scheiner*, 483 US 266, 269, 107 S Ct 2829, 97 L Ed 2d 226 (1987).

The issues in this case concern the application of the dormant Commerce Clause to Oregon's taxation of truckers involved in interstate commerce. The United States Supreme Court has used a number of tests over the years to determine when a state tax violates the dormant Commerce Clause, and the tests have not necessarily been consistent. However, since *Complete Auto Transit, Inc. v. Brady*, 430 US 274, 97 S Ct 1076, 51 L Ed 2d 326 (1977), the Court has developed an approach that it continues to use. In *Complete Auto Transit, Inc.*, the Court held that it will sustain

> "a tax against [a] Commerce Clause challenge when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State."

430 US at 279. In this case, the issues involve the "fair apportionment" and "nondiscrimination" elements of the test; plaintiffs do not assert that there is no substantial nexus between their activities and Oregon or that the highway taxes are not fairly related to the services that the state provides. In other words, plaintiffs argue that the exceptions to Oregon's weight-mile tax place interstate commerce at a disadvantage when it competes with intrastate commerce.

■ In *Container Corp. v. Franchise Tax Bd.*, 463 US 159, 103 S Ct 2933, 77 L Ed 2d 545 (1983), the Court discussed how to determine when a tax is fairly apportioned and when it is nondiscriminatory. Those concepts are closely related. The Court held that "fair apportionment" requires the tax to be both internally and externally consistent. As applied to the state taxation of the income of a unitary business, which was the issue in *Container Corp.*, "internal consistency" means that, if every jurisdiction applied the same tax, no more than all of the business's income would be taxed. 463

US at 169. In a more recent case the Court described the concept more fully:

> "Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear. *This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate.* A failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax."

*Oklahoma Tax Comm'n. v. Jefferson Lines, Inc.*, 514 US 175, 185, 115 S Ct 1331, 131 L Ed 2d 261 (1995) (emphasis added).

■    The internal consistency test thus does not look at the actual effect of the tax on interstate commerce but at whether it would, in theory, place interstate commerce at a disadvantage if all states adopted the identical tax. In contrast, "external consistency" means that the factor or factors used in the apportionment formula must actually reflect how income is generated. *Container Corp.*, 463 US at 169-70. In this case, plaintiffs do not contend that "external consistency" is an issue.

■    "Fair apportionment" is closely related to "discrimination in effect," if not in intent.[6] "Internal consistency" appears to be the primary test for determining whether a tax discriminates against interstate commerce in its effect. For determining both fair apportionment and discrimination in effect, the issue is whether the tax, if universally applied, would impermissibly interfere with free trade. *See Armco Inc. v. Hardesty*, 467 US 638, 644-45, 104 S Ct 2620, 81 L Ed 2d 540 (1984) (tax that unfairly apportions income from other

---

[6] Proof of unconstitutional discrimination does not require proof that the state had a discriminatory purpose. It is sufficient to show that the effect of its actions was discriminatory. *See Bacchus Imports, Ltd. v. Dias*, 468 US 263, 270, 104 S Ct 3049, 82 L Ed 2d 200 (1984).

states is a form of discrimination against interstate commerce). With regard to interstate commerce, the prohibition of discrimination does not require much more than that the test of "fair apportionment" be satisfied. *Container Corp.*, 463 at 170-71.

Plaintiffs rely heavily on *Scheiner* with regard to the application of the "fair apportionment" and "discrimination in effect" tests to the flat fee and farm truck fuel tax exceptions to the weight-rule tax. In that case, the Supreme Court held that two flat fees that the State of Pennsylvania imposed on trucks operating within its borders violated the dormant Commerce Clause. Those fees were, first, a fee of $25 that the state charged between 1980 and 1982 for an identification marker that had to be affixed to every motor carrier vehicle. The state deemed the fee to be part of the registration fees for Pennsylvania-registered vehicles, thus making them exempt from it. In 1982, the state reduced the marker fee to $5, which approximated the cost of administering the marker program. At the same time, it enacted a second flat fee, a tax of $36 per axle for every vehicle that operated more than 2,000 miles in Pennsylvania, and it reduced registration fees for vehicles registered in the state by the amount of the axle tax. As a result, Pennsylvania-registered vehicles paid the same amount before the change as afterwards, but interstate trucking companies had their taxes increased. The lead plaintiff in this case and several trucking companies challenged the Pennsylvania fees as violations of the Commerce Clause.

■ The decisive question for the Court in *Scheiner* was "do the methods by which the flat taxes are assessed discriminate against some participants in interstate commerce in a way that contradicts the central purpose of the Commerce Clause?" *Scheiner*, 483 US at 282. In answering that question, the Court found dispositive those cases that made it clear that the Commerce Clause "prohibits a State from imposing a heavier tax burden on out-of-state businesses that compete in an interstate market than it imposes on its own residents who also engage in commerce among States." *Id.* Pennsylvania's method of taxing failed that standard because it did not treat Pennsylvania-registered vehicles and vehicles from other states consistently. It would undoubtedly

deter interstate commerce for every state to impose similar fees for the privilege of making commercial entries into its territory. *Id.* at 284. In that situation, a trucker that operated in several states would pay several fees, one to each state, while a trucker that operated solely in Pennsylvania would pay only one fee, to Pennsylvania. Consequently, the taxing scheme had "a forbidden impact on interstate commerce because it exert[ed] an inexorable hydraulic pressure on interstate businesses to ply their trade within the state that enacted the measure rather than 'among the several states.'" *Id.* at 286-87. For that reason, a state's imposition of an unapportioned flat tax discriminates against interstate commerce. *Id.* at 292. Flat taxes are constitutionally permissible only "when they are the only practicable means of collecting revenues from users and the use of a more finely graded user fee schedule would pose genuine administrative burdens." *Id.* at 296.

As defendants point out, the flat fee options at issue in this case differ from the flat fees in *Scheiner* because they are optional in nature. Carriers who do not choose the flat fee option will pay a weight-mile tax that is properly apportioned and that does not discriminate. In addition, the flat fee option applies only to a limited number of commodities; for that reason alone, most carriers operating in Oregon, both those that operate primarily interstate and those that operate primarily intrastate, pay the weight-mile tax. However, while those facts may limit the discriminatory effect of the flat fees, they do not necessarily make them constitutional. It remains possible that the very act of choosing the flat fee will encourage a carrier to focus on intrastate rather than interstate commerce.

In deciding this kind of issue, the Supreme Court's case law does not rely on the specific evidence in a specific case as the foundation for its conclusions concerning a particular tax. Rather, it focuses on the structure of the tax at issue, something that in this case can readily be perceived by describing hypothetical situations. Here, the focus is on carriers whose trucks travel more miles in Oregon than the amount that the legislature presumed.[7] As one example,

---

[7] Because a carrier that expects its trucks to operate in Oregon for fewer than the presumed number of miles has an economic incentive to choose to pay the

assume that the weight-mile tax for a particular truck is 10 cents per mile, that the legislature presumes that the average truck carrying the commodity involved will travel 40,000 miles per year in Oregon, and that the legislature has therefore set an alternative flat fee at $4,000 per year.[8] Carrier A has trucks that actually travel 50,000 miles per year entirely in Oregon; it elects to pay the flat fee and therefore pays $4,000 per truck, or an effective rate of 8 cents rather than 10 cents per mile. Carrier B has trucks that also operate 50,000 miles per year, but they operate half the time in Oregon and half the time in other states with identical tax systems. Carrier B would lose money by electing to pay the flat fee in any state that has such a taxing scheme because the flat fee is calculated on an amount of mileage greater than its trucks will travel in any one state. Thus, economic necessity requires carrier B to elect to be taxed on the basis of its mileage, and its total taxes will be $5,000 per truck, or an effective rate of 10 cents per mile. Such a taxing scheme favors intrastate carriers over interstate carriers. Any other hypothetical situation, using any other figures for an unapportioned flat fee option, will show a similar malapportionment and discriminatory effect as to interstate carriers that exceed the presumed average mileage.

In this hypothetical situation, the flat fee option will both exert pressure on the interstate carrier to change its operations to focus on intrastate business and will discriminate against the interstate carrier if it does not do so. Only by focusing on intrastate business can the carrier pay the lower tax rate that similarly situated intrastate carriers are able to pay. The flat fee options, thus, discriminate between interstate and intrastate carriers whose businesses differ only because of their relationship to state boundaries, and the discrimination operates to the detriment of the interstate carrier. The flat fee options do not apportion the tax burden among the states where the interstate carrier operates, and they therefore fail the "internal consistency" test.

weight-mile tax, those who choose the flat fee option will usually expect to operate more than the presumed mileage.

[8] The actual tax system involves additional factors. Including them would make that hypothetical more complex but would not affect the conclusions that we draw from it.

Defendants counter that the flat fee is necessary because of the difficulty of administering the weight-mile tax. They argue that carriers of the affected commodities frequently travel off state highways, use less-traveled highways where the costs of enforcing the tax may exceed the amounts received, and make multiple short trips that make record keeping difficult. However, as plaintiffs point out, many carriers of the same commodities do not choose the flat fee, and the administrative problems that defendants describe also exist as to them. The flat fee options cannot fully resolve those problems, and defendants have not demonstrated that the flat fee options are the only practicable way of collecting the taxes in issue.

■　　　The trial court took a different legal approach from what we have described, an approach that defendants endorse. The court relied on the general principles for determining when a state regulation violates the dormant Commerce Clause that the Court described in *Pike v. Bruce Church, Inc.*, 397 US 137, 142, 90 S Ct 844, 25 L Ed 2d 174 (1970):

> "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

The trial court applied those principles and concluded that there was insufficient evidence to show that the flat fee options had more than an "incidental" effect on interstate commerce. It also held that the system was internally consistent because the evidence showed that out-of-state carriers who paid the flat fees benefitted disproportionately to in-state carriers who paid those fees. In addition, it pointed out that flat fee commodities generally travel relatively short, mostly in-state distances and that, as a group, wood chip carriers who chose the flat fees paid more than if they had paid the weight-mile tax.

Our understanding of the applicable case law leads us to the conclusion that the Supreme Court does not apply a

*Pike*-type balancing test to the taxation of interstate commerce. Rather, it holds that any malapportionment or discrimination will invalidate the challenged tax. "[W]here simple economic protectionism is effected by state legislation, a stricter rule of invalidity has been erected." *Bacchus Imports, Ltd. v. Dias*, 468 US 263, 270, 104 S Ct 3049, 82 L Ed 2d 200 (1984). Thus, the Court will base a finding that state legislation constitutes economic protectionism on either a discriminatory intent or a discriminatory effect. *Id*. As we previously discussed, the Court has also made it clear that it is the inherent tendency of a tax, not the effects that the tax has actually produced, that matters for the "internal consistency" test. A tax that fails that test is both malapportioned and discriminatory in effect.

In addition, what matters under the dormant Commerce Clause is not where a carrier is based but where it does business; a Washington carrier that pays a flat fee in Oregon would have the same economic pressure to focus on Oregon intrastate business that exists for an Oregon carrier that chose that option. The Oregon flat fee options provided in ORS 825.480 create a disproportionate pressure that the dormant Commerce Clause forbids. As we have illustrated by our hypothetical example, that exception to the weight-mile tax necessarily violates the Commerce Clause because it puts interstate carriers at a disadvantage when compared with intrastate carriers.

Defendants also argue that the flat fee options are a use tax that the state collects to pay for specific services— constructing and maintaining highways—that it provides. As such, they argue, they are not subject to the fair apportionment and anti-discrimination requirements that we have discussed. Defendants rely on *Evansville Airport v. Delta Airlines*, 405 US 707, 716-17, 92 S Ct 1349, 31 L Ed 2d 620 (1972), in which the Court upheld a fee of one dollar charged to each airline passenger for the use of the airport. The problem with that argument is that the flat fees involved in *Scheiner* were also designed to pay for Pennsylvania's highways; the Court distinguished *Evansville* on the ground that those fees discriminated against out-of-state vehicles by subjecting them to a much higher charge per in-state mile and did not purport to approximate failure the cost or value of

using Pennsylvania's roads. *Scheiner*, 483 US at 290. In essence, the fees in *Evansville* were self-apportioning and were directly tied to the services provided, while the flat fees at issue in *Scheiner* were not apportioned and thus were not true use taxes. The same is true of the flat fee options at issue in this case. Once a carrier chooses to pay the flat fee, the amount of its taxes is set at a specific amount that is not related to the miles traveled or the services that the state actually provides. While the weight-mile tax may well be a use tax, the flat fee options are not.

Defendants cross-assign error to the trial court's finding that carriers of general commodities and carriers of flat fee commodities are similarly situated for purposes of the dormant Commerce Clause. We do not need to decide that issue. Carriers of flat fee commodities who are not able to take advantage of the flat fee options are sufficiently similarly situated to carriers of those commodities who are able to do so to state a claim under that clause, so the issue does not affect plaintiffs' standing. The parties appear to believe that this issue may affect the remedies on remand; in particular, defendants are concerned that invalidating the flat fee options may lead to invalidating the entire weight-mile tax. In *Bacchus Imports*, for example, the Court invalidated the Hawaii liquor tax because it unconstitutionally exempted certain locally produced liquors. However, in *Bacchus Imports*, the exemption was absolute; the liquors in question were not taxed at all. In contrast, the flat fee options in this case are alternatives to the weight-mile tax; invalidating the flat fee options simply means that all carriers are subject to the underlying weight-mile tax. Carriers who carried flat fee commodities and who paid the weight-mile tax rather than a flat fee may be entitled to an appropriate remedy on remand, but the nature of that remedy will not depend on whether the carriers involved competed in the same market with carriers of nonflat fee commodities. Thus deciding the cross-assignments of error will not have a practical effect on the parties' rights on remand.

Next, we turn to the farm truck fuel tax exception in ORS 805.310. Plaintiffs point out that nonfarm carriers carry many of the commodities that farmers carry and that farm trucks benefit from paying the fuel tax. They argue that farm

trucks are therefore in competition with nonfarm carriers and receive discriminatory preferences because the former pay lower taxes. The parties dispute a number of factual issues related to that argument, including whether farm trucks and nonfarm carriers compete in the same market. Those disputes are irrelevant to the validity of the tax. As defendant AAA Oregon/Idaho points out, plaintiffs fail to show that the fuel tax discriminates between interstate and intrastate carriers. Under the fuel tax exception for farm trucks, it does not matter where a farm truck is based. To the extent that it does business in Oregon and qualifies as a farm vehicle, it will pay the fuel tax instead of the weight-mile tax. If every state adopted the fuel tax exception, there would be no malapportionment or discrimination between interstate and intrastate carriers. Both kinds of carriers would receive an equivalent economic benefit from the exception.

The dormant Commerce Clause prohibits discrimination between interstate and intrastate commerce; it does not prevent the legislature from providing benefits for certain economic groups if those benefits do not involve such discrimination. The fuel tax satisfies the tests that the Court established in *Complete Auto Transit, Inc*. If every state adopted the same tax system, farm vehicles would pay the same taxes whether they operated intrastate or interstate. Thus, the tax is internally consistent, and it is therefore fairly apportioned and does not discriminate in effect. There is also no evidence of a discriminatory intent. The tax applies to an activity with a substantial nexus to Oregon and is fairly related to the services that Oregon provides. We conclude that the fuel tax exception for farm vehicles embodied in ORS 805.310 does not violate the dormant Commerce Clause.

Plaintiffs also argue that the fuel tax exception violates the Equal Protection Clause of the Fourteenth Amendment. The trial court held that there was no equal protection violation because the fuel tax had the legitimate purpose of protecting agriculture. Plaintiffs respond that a state cannot legitimately promote its local economy through a tax system that is designed to favor domestic industry at the expense of industry outside of the state. *See Metropolitan Life Ins. Co. v. Ward*, 470 US 869, 105 S Ct 1676, 84 L Ed 2d 751 (1985). The problem with that argument is that the fuel tax exception

does not discriminate between Oregon and out-of-state farmers. Unlike the higher tax for out-of-state insurance companies that was at issue in *Metropolitan Life Ins. Co.*, the exception favors agriculture in general, not agriculture in Oregon. Because the issue does not involve a protected class, plaintiffs must show that there is no rational relationship between the exception and a legitimate state policy. *See Kadrmas v. Dickinson Public Schools*, 487 US 450, 457-58, 108 S Ct 2481, 101 L Ed 2d 399 (1988). The legislature's decision to benefit farmers when it adopted the fuel tax exception for farm vehicles was a policy choice for it to make. We see nothing irrational about the means that it chose to achieve its purpose. Thus, we agree with the trial court that the exception does not violate the Equal Protection Clause.

Because of its decision upholding the validity of both provisions, the trial court did not consider the remedies for the violations that we have found. On remand, it shall enter an appropriate declaratory judgment that is consistent with our rulings in this opinion, that resolves all of the parties' contentions, and that awards any appropriate relief.

Reversed and remanded with instructions to enter declaratory judgment declaring the flat fee options unconstitutional, otherwise resolving the parties' contentions, and awarding any appropriate relief; otherwise affirmed.